NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

20-P-748

COMMONWEALTH

vs.

THOMAS CRADOCK.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Superior Court jury convicted the defendant of aggravated rape, armed assault with intent to murder, assault and battery by means of a dangerous weapon causing serious bodily injury, and aggravated assault and battery causing serious bodily injury.  The defendant filed a motion for a new trial on grounds of ineffective assistance of counsel, which the trial judge denied.  Concluding that there was sufficient evidence of the defendant's identity as the assailant, any error in the admission of expert testimony was not prejudicial, the prosecutor's closing argument was proper, and the record does not support the defendant's newly raised ineffective assistance

claims, we affirm the judgments and the order denying the motion for a new trial.

Background.  In the early morning on a Wednesday in September 2011, the victim drove her two dogs to a dog park. The victim parked her car and walked her dogs toward the park. On her way to the park, the victim walked down the street where the defendant lived.  As the victim approached the park, she dropped the dogs' leashes to allow the dogs to go ahead of her. The victim's next memory was waking up in a hospital about a month later.

Later that morning, around 7 A.M., a woman looked out of her back porch and saw the victim's naked, bloody body in the vacant lot next door to her home.  She called 911 and her husband waited near the lot until police, fire, and emergency medical personnel arrived.  The victim was brought to the emergency room at Massachusetts General Hospital for treatment. The victim's eyes were swollen shut, and she required staples in her head.  She had suffered a skull fracture, which caused her brain to swell and required a piece of her skull to be removed. She also had fractured nasal and orbital bones.  The victim could not speak and had to be intubated.  As a result of her injuries, the victim required significant rehabilitation to relearn basic living and communication skills.

A sexual assault nurse examiner examined the victim. The victim had abrasions, redness, and lacerations on her cervix and genitals. Swabs of her vaginal, perianal, anorectal, and external genital areas all tested positive for the presence of semen. Sperm cells from internal vaginal and anorectal swabs matched the defendant's deoxyribonucleic acid (DNA). The victim's underwear had been torn off her body and recovered by police a few feet from where she was attacked. A stain on the exterior of the victim's underwear tested negative for the presence of semen. A serologist from the Boston Police Department Crime Laboratory testified for the Commonwealth that she would have expected to find semen on the victim's underwear if the underwear had been worn after the semen was deposited.

At trial and on appeal, the defense argued that the defendant's sperm was deposited in the victim's body when they had consensual sexual intercourse several days before the attack. The defendant testified that, on an unknown Saturday night in September 2011, he had unprotected sexual intercourse with an unknown woman in her late twenties with "light brown" hair and a "petite" build. The defendant did not know the woman with whom he had consensual sex and did not "remember specific details about the woman that night." When shown a photo array, the victim did not identify the defendant. When shown a photograph of the victim, the defendant did not recognize her.

3

Discussion. 1. Sufficiency of the evidence. We review the sufficiency of the evidence to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (citation omitted). Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). The defendant contends that the evidence was insufficient to establish his identity as the assailant. See Commonwealth v. Brown, 490 Mass. 171, 176 (2022). "[T]he Commonwealth does not have to present evidence that exclude[s] every reasonable hypothesis of innocence" (quotation and citation omitted). Commonwealth v. French, 476 Mass. 1023, 1025 (2017). Where the defendant's guilt is proved solely through the presence of physical evidence, "[t]he Commonwealth does have to present evidence that reasonably excludes the hypothesis that the [physical evidence] was left at some time other than when the crime was committed." Id.

Here, the defendant lived just a few blocks from the crime scene, and the victim had walked down his street just minutes before she was attacked. The attack occurred on a Wednesday morning between 4 A.M. and 7 A.M., and biological evidence was collected from the victim's body shortly after 3 P.M. on the same day. Swabs from the victim's vaginal, perianal, and anorectal areas all tested positive for the presence of semen,

4

and sperm cells from the vaginal and anorectal swabs compared to the defendant's DNA at astronomical match probabilities.[1]  This was sufficient evidence for a rational juror to conclude that the defendant was the victim's assailant, absent evidence reasonably excluding any alternative explanation.

At trial, the defendant intimated that he may have had consensual sex with the victim days before the attack.  However, the Commonwealth presented evidence reasonably excluding this entirely speculative hypothesis.  The defendant testified that he had unprotected, consensual sexual intercourse with a random woman about whom he did not "remember specific details," in a bathroom at a private party at an unknown location in September 2011.  When shown a photograph of the victim, the defendant did not recognize her.  The defendant "believe[d it] was a Saturday night," but did not testify whether this sexual encounter occurred before or after the date the victim was attacked.  Even if we assume it occurred the Saturday before the attack, the victim testified that she did not know the defendant, did not recognize him from his photograph, and never had consensual sex with him.  The victim's testimony was sufficient to permit the jury to find that the defendant's semen was not deposited at

_____

[1] The DNA characteristics of these sperm cells are "expected to be found approximately one in 160 quintillion Caucasians, one in 100 sextillion African-Americans and one in 280 quintillion Southeastern Hispanics."

5

some time other than when the rape was committed.  See Commonwealth v. Scott, 470 Mass 320, 324-325 (2014).

Furthermore, the physical evidence excluded any reasonable possibility that the victim was the unidentified woman from the party.  There was powerful evidence that the defendant's semen was present on the anorectal swab, as well as inside the victim's vagina.  However, the defendant did not testify that he had anal intercourse with the unidentified woman from the party.  Although the swab of the victim's external genitals also tested positive for sperm, the serologist testified that she forwarded only the anorectal and vaginal swabs for DNA testing because "they are from internal cavities" and "the internal cavities are the most probative samples in terms of proving penetration." This evidence rendered implausible the defendant's theory that his semen was deposited during a consensual sexual encounter that occurred several days earlier.  In addition, the serologist testified that she would have expected semen to be present on the victim's underwear if the underwear had been worn after the semen was deposited.  Yet, despite other stains indicating they had been worn inside-out before they were torn from her body during the attack, the victim's underwear tested negative for the presence of semen.  Thus, we conclude that the Commonwealth presented sufficient evidence to reasonably exclude the defendant's hypothesis that the defendant's sperm cells had been

6

left inside the victim several days before the attack.  See French, 476 Mass. at 1025.

2.  Expert testimony.  The defendant argues that the Commonwealth went too far at trial rebutting his explanation for the presence of his DNA by improperly offering "time-since-intercourse" evidence.  The serologist testified generally about time-since-intercourse based on her professional experience and an unpublished, non peer-reviewed internal study performed at the Boston Police Crime Laboratory.  The serologist's testimony related to how long after an alleged sexual assault and before evidence collection a sperm cell could remain "intact," defined as retaining its tail.  The serologist testified that she had never observed intact sperm cells from a kit collected over twenty-four hours after an alleged assault.

"[I]t is not uncommon for a State police chemist to opine on the life expectancy of sperm cells."  Commonwealth v. Rice, 441 Mass. 291, 299 (2004).  Here, however, the defendant asserts that the serologist was not qualified to offer such an opinion because her testimony was based on "personal anecdotal experience" rather than reliable scientific methodology.  The defendant further asserts that the testimony wrongfully gave the impression that his defense was "scientifically impossible."  We need not reach these arguments because, even assuming there was error, it was not prejudicial.  As discussed, there was

7

compelling evidence of the defendant's guilt, and his hypothesis that his semen may have been deposited during consensual sex with the victim several days before she was attacked was refuted by the evidence that his semen was present on the anorectal swab and by the evidence that there was no semen on the victim's underwear.  Moreover, the defendant presented his own expert, who testified that the scientific literature shows that sperm cells can remain intact for five days after intercourse or even longer, contradicting the serologist's testimony.  Thus, even if the serologist's testimony was improper, any "error was not prejudicial," especially "given the overwhelming evidence of the defendant's culpability."  See Commonwealth v. Mason, 485 Mass. 520, 537 (2020).

3. Closing argument.  The defendant contends that the trial prosecutor misstated the evidence when she argued in closing that the victim's underwear was "negative for semen."[2] Because the defendant did not object to the challenged remark, we review any error for a substantial risk of a miscarriage of justice.  See Commonwealth v. Shruhan, 89 Mass. App. Ct. 320, 326 (2016).  "The defendant has a considerable burden to

---

[2] The defendant also argues that the prosecutor's closing improperly relied on the serologist's erroneously admitted time-since-intercourse testimony.  The defendant was not prejudiced by the prosecutor's reference to that testimony, for the same reasons he was not prejudiced by any error in admitting the testimony.

8

demonstrate that an alleged error, or combination of errors, by the prosecutor in closing argument, caused a substantial risk of a miscarriage of justice."  Id.  "In closing argument, [p]rosecutors are entitled to marshal the evidence and suggest inferences that the jury may draw from it" (quotation and citation omitted).  Commonwealth v. Parker, 481 Mass. 69, 74 (2018).

Although a white stain on the victim's underwear tested positive for acid phosphatase, the serologist explained that acid phosphatase can be found in both seminal fluid and vaginal secretions.  Thus, the serologist examined the stain for sperm cells, found none, and concluded that the test was "confirmatory negative" for the presence of semen.  The prosecutor's statement that the underwear tested negative for semen was supported by the serologist's testimony.  Thus, the closing argument was properly based on a reasonable inference from the evidence and was a fair argument.  See Commonwealth v. Roy, 464 Mass. 818, 824 (2013) (inferences need only be reasonable and possible, not necessary or inescapable).

4.  Ineffective assistance of counsel.  The defendant asserts that trial counsel was ineffective because she did not present expert testimony that countered the Commonwealth's case that the defendant deposited the sperm in the victim's body when he attacked her.  We review a judge's decision on a motion for

9

new trial for error of law or abuse of discretion. See Commonwealth v. Tavares, 491 Mass. 362, 365 (2023). Where the motion judge was also the trial judge, "we give special deference to the judge's findings of fact and the ultimate decision on the motion" (quotation and citation omitted). Commonwealth v. Corey, 493 Mass. 674, 684 (2024). To prevail on his claim of ineffectiveness of counsel, the defendant must show that: (1) counsel's conduct fell "measurably below that which might be expected from an ordinary fallible lawyer"; and (2) this conduct "likely deprived the defendant of an otherwise available, substantial ground of defence." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). "Thus, a defendant must prove both deficient performance and prejudice." Commonwealth v. Chleikh, 82 Mass. App. Ct. 718, 722 (2012).

Specifically, the defendant contends that trial counsel was ineffective for failing to ensure that an expert examined the condition of degraded sperm cells on slides prepared by the Commonwealth, failing to cross-examine the serologist on this topic, and failing to pursue independent testing of the victim's underwear. As the defendant acknowledges, he did not raise these arguments in his motion for a new trial. We disagree with the defendant's assertion that the factual basis of these claims

10

appears indisputably on the trial record.  We therefore decline to address them.

Judgments affirmed.

Order denying motion for a
  new trial affirmed.

By the Court (Shin, Ditkoff &
  Brennan, JJ.[3]),

Clerk

Entered:  December 12, 2024.

---

[3] The panelists are listed in order of seniority.

11